ROGERS, Justice.
John Richard was found guilty of the murder of Joseph Rice and sentenced to death. Without filing a motion for a new trial, defendant appealed from his conviction and sentence. The State, through counsel, has moved to dismiss the appeal on the ground that defendant failed to exhaust his remedies in the district court.
Article 559 of the Code of Criminal Procedure is invoked in support of the motion. The article reads in part as follows: “No new trial can be granted on appeal unless a motion for same has been made and refused in the lower court; * * The article has been invoked and applied by this Court in a number of cases, among which may be mentioned State v. Stinson, 174 La. 510, 141 So. 44; State v. Eubanks, 179 La. 92, 153 So. 31; State v. Stephens, 183 La. 431, 164 So. 162; and State v. Kennedy, 192 La. 846, 189 So. 450. But none of those cases involve convictions carrying the death penalty.
We are not disposed, in capital cases, to rigidly apply the provisions of Article 559 of the Code of Criminal Procedure, but, as a matter of precaution, prefer to examine the record for the purpose of ascertaining whether the proceedings leading to defendant’s .conviction are regular and according to law. This Court followed that procedure in State v. Cooley, 185 La. 1032, 171 So. 435, 436, where the defendant was convicted and sentenced for the offense of assault with a dangerous weapon. Defendant relied on five bills of exception which were reserved during the course of the trial. Four of those bills were timely presented to the trial judge for his signature and per curiam. This Court considered the bills notwithstanding defendant failed to file a motion for a new trial in the district court, saying: “We have, in the abundance of precaution, considered these bills, although, under the provisions of article 559 of the Code of Criminal Procedure, and the case of State v. Stephens, 183 La. 431, 164 So. 162, we might have dismissed them.” The Court then reviewed the five bills of exception reserved by the defendant and found them to be without merit.
The defendant in this case has been condemned to death. If the motion to dismiss filed by the State should prevail, the sentence must be carried out without defendant having had the right of appeal, because his attorney inadvertently failed to file a motion for a new trial. It is clear that the attorney for the defendant, by failing to file the motion, did not intend to abandon his client’s right to an appeal, because he actually applied for and perfected the appeal by filing the transcript in *725 this Court. If, as in the case of State v. Cooley, this Court felt that, notwithstanding the provisions of Article 559 of the Code of Criminal Procedure, in the abundance of precaution, it should consider the bills of exception where the offense charged was assault with a dangerous weapon, there is all the more reason why the Court should examine the record for possible errors in this case, where the defendant is sentenced to death, notwithstanding the attorney for the defendant inadvertently failed to file a motion for a new trial.
We shall therefore consider the two bills of exception that were reserved during the course of the defendant’s trial.
Both bills of exception present the same question of law. The first bill of exception was reserved to the ruling of the trial judge sustaining an objection made by the State to a question propounded to the defendant by his counsel as to whether a certain Mrs. Bonin had informed him that the deceased carried a pistol. The second bill of exception was .reserved to the ruling of the trial judge sustaining an objection of counsel for the State to a question propounded to defendant by his counsel as to whether the deceased had drawn on him a large “Texas Jack knife,” which was found under the body of the deceased, when he, the defendant, was unarmed and immediately prior to the killing, and whether dr not the deceased carried a pistol, defendant stating that he had been so informed before the killing by Mrs. Bonin.
The objection urged by counsel for the State to the questions set forth in both bills of exception was that no overt act had been shown and, further, that the statements were hearsay.
In order that the rulings complained of under the bills of exception may be correctly disposed of, it is necessary to set forth the facts as they appear in the record. Briefly stated, they are as follows: The defendant, John Richard, a negro, after his release following eleven years’ imprisonment in the State penitentiary for the murder of his wife in the Parish’ of Acadia, moved to the Parish of Iberia where he engaged as a common laborer in farming operations. Some time thereafter, he lived in concubinage with Mary Ledet, a negro woman. There was quite a disparity in their ages. Richard was a man in his early sixties and Mary Ledet was quite a young woman. Mary Ledet left defendant Richard and went to live with the deceased, Joseph Rice, and, as testified to by Richard, he became the object of ridicule, practical jokes, and the laughing-stock of other negroes living on the plantation.
On the morning of the homicide, while defendant was visiting the home of friends, the deceased, Joseph Rice, and Mary Ledet walked in, and, on seeing the accused, laughingly referred to their domestic troubles, which amused the bystanders but enraged the defendant. He left and walked to his home which fronted on a farm road, a distance of about ten acres away. Defendant obtained a double-barreled shotgun, loaded it with home-made slugs, and waited for the deceased and Mary Ledet, knowing that they would walk along the *727 farm road to return to their own home. When they approached the house of the defendant, he was standing at his gate entrance fronting the road. Seeing defendant thus armed, the deceased took out and opened his pocket knife, apparently for such protection as it would afford him in case of an assault. The farm road is about twenty feet wide. There is a house located on the opposite side of the road, a stone’s throw from defendant’s home, in which several negroes were conversing, some at the entrance, it being a Sunday morning, about ten o’clock. All these negroes were eyewitnesses to the homicide. When the deceased and Mary Ledet approached the home of defendant, they were walking on the shoulder of the road on the side opposite that of defendant’s home, the deceased about ten steps ahead of Mary Ledet. When they were directly opposite the defendant’s home, the defendant called to the deceased to “stop.” Neither the deceased nor Mary Ledet heeded this command, both continuing to walk along the opposite side of the road moving away from defendant. The defendant again cried out, “Stop,” repeating it for the third time, and finally saying, “Stop, I said.” During the course of these commands, neither the deceased nor Mary Ledet replied thereto, but on the contrary, continued walking away from the defend-, ant. Not a single reply was made by the deceased or by Mary Ledet to the defendant. When defendant’s fourth and last warning was again disregarded, the defendant fired the fatal shot of slugs, striking the déceased over the right side of the face and the back of his head, killing him instantly. As testified to by the eyewitnesses and the coroner, some of the slugs entered the region of the head around the deceased’s right ear, because at the moment of the shooting, the deceased had turned his head to the right to look over his shoulder in the direction of the defendant, undoubtedly to see what the defendant proposed to do.
After killing Joseph Rice, the defendant then looked toward Mary Ledet and said, “I killed him and I may as well kill you.” He then fired his second gun barrel at her, striking her in the head and killing her instantly.
It was repeatedly shown, even by the testimony of the defendant himself, that at the time of the killing the deceased was about forty feet away from the defendant on the opposite side of the road from defendant’s home and that he had his back turned walking away from the defendant. The location of the bodies, as testified to by the coroner, fully confirmed the statements of the eyewitnesses.
Immediately after the double homicide, the defendant ran into his home, reloaded his gun, and escaped through the sugarcane fields. After leaving his gun -at the home of a relative in the City of Lafayette, he continued his flight to the Parish of Jefferson Davis, where he was some time thereafter identified and arrested while working under an alias in a rice field.
All these facts were testified to by five negroes who were eyewitnesses to the homicide. All of them heard what was *729 said by the accused and observed .what actually transpired. Each of these witnesses testified positively that neither Joseph Rice nor Mary Ledet made any demonstration or movement of any kind toward the accused; that they addressed no word to him; that Joseph Rice, the deceased, during all the commands of the defendant, completely ignored them, made no reply and continued on his peaceful way along the roadside, moving away from the defendant and occasionally glancing over his shoulder towards him; that, on being shot from the rear, the deceased fell forward to the shoulder of the road, and that when the coroner arrived, on turning the body face upwards, an open pocket knife was found beneath him.
The only evidence of an overt act or hostile demonstration was that given by the defendant himself. However, his testimony was not consistent as to what actually took place. He testified that while he was standing at his gate, the moment the deceased arrived, he, the deceased, ■opened his knife and that without any exchange of words, advanced towards defendant; that defendant cried out, “Drop it,” ran into his house, obtained his gun and came out and shot the deceased. On ■direct examination, however, he testified that at the time he fired the fatal shot, the deceased was fully forty feet away and walking away from him. Defendant was not only contradicted as to the alleged knife attack by the five eyewitnesses of the occurrence, but also by the physical facts.
The gunshot wounds were found in the back of the deceased’s head and the position of the deceased in relation to the defendant at the time of the killing corroborated the testimony of the eyewitnesses.
Based on the foregoing facts, the trial judge assigned the following as his reasons for excluding the testimony, to-wit: “This court is of the opinion that the killing was .one without justification, or the slightest provocation, a deliberate, inexcusable homicide. The evidence in this case of an overt act, physical attack or hostile demonstration on the part of the deceased toward the accused at the time of the homicide is clearly wanting. Neither has it been shown to the point of any degree of reasonable sufficiency, indicative to a reasonable person, that the accused was in apparent and imminent danger of losing his life or of receiving great bodily harm.”
It is provided in Article 482 of the Code of Criminal Procedure that, “in the absence of proof of hostile demonstration or of overt act on the part of the person slain or injured, evidence of his dangerous character or of his threats against accused is not admissible.”
There is no error in the ruling of the trial judge in excluding evidence of threats against the accused, in the absence of proof of hostile demonstration or of overt act on the part of the deceased at the time of the killing. This is the settled jurisprudence as well as the statutory law. *731 State v. Carter, 197 La. 155, 1 So.2d 62, and authorities therein cited.
For the reasons assigned, the conviction and sentence appealed from are affirmed.